Rec 0106533

ORIGINAL

FILED

MAY 17 2007

U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. __________

07-306 T

JOYCE A. RINEER,

Plaintiff

v.

THE UNITED STATES,

Defendant

COMPLAINT

Plaintiff, Joyce A. Rineer, by and through the undersigned counsel, files this Complaint against Defendant, The United States, and alleges as follows:

1. Plaintiff is an individual whose principal place of residence is located at 8204 Hallmark Dr., North Richland Hills, Texas 76180, and her social security number is xxx-xx-3945.

2. Defendant is The United States and may be served by the Clerk of this Court by delivering five copies of this Complaint to the Honorable Alberto R. Gonzales, Attorney General of the United States, 10th St. and Constitution Ave., N.W., Washington, D.C. 20530.

3. This is a civil action against The United States for the recovery of the trust fund recovery penalty erroneously and illegally assessed against and collected from Plaintiff in the total amount of $759.00, or such other amount as in law and in fact is recoverable.

4. This Court has jurisdiction herein pursuant to 28 U.S.C. §1346.

5. Defendant claims that Plaintiff is liable for the trust fund recovery penalty pursuant to 26 U.S.C. §6672 for Specialty Care, Inc.

6. Plaintiff is not a responsible person or willful pursuant to 26 U.S.C. §6672 with respect to taxes withheld from the wages of employees of Special Care, Inc., and not paid over to Defendant.

7. Within two years after the penalty described in paragraph 3 was collected from Plaintiff, Plaintiff timely submitted a claim for refund and request for abatement on or about December 19, 2006, with the Internal Revenue Service Center in Dallas, Texas. Plaintiff's claim for refund and request for abatement is attached hereto as Exhibit "A" and incorporated herein by reference. The claim for refund and request for abatement was disallowed by the Technical Services Advisory Group Manager, Internal Revenue Service, in Dallas, Texas, by letter dated February 28, 2007, and two years have not elapsed since the taking of such action.

8. Defendant has refused and continues to refuse to refund the penalty claimed by Plaintiff; and, for the reasons set out in Plaintiff's claim for refund and request for abatement, Plaintiff is entitled to and hereby demands judgment against Defendant for the full sum of $759.00, together with statutory interest.

WHEREFORE, Plaintiff prays for judgment against Defendant in the amount of $759.00, or such other amount to which he is entitled in law and in fact, together with interest thereon according to law, for costs, attorneys' fees and such other and further relief as may be just and appropriate in the premises.

Respectfully submitted,

**TOWNSEND & JONES, L.L.P.**

Dated: May 16, 2007

By: ______________________

Lawrence R. Jones, Jr.
8100 Lomo Alto, Suite 238
Dallas, Texas 75225
(214) 696-2661
(214) 764-3320 - Fax

**ATTORNEYS FOR PLAINTIFF**

Form **843**
(Rev. November 2005)
Department of the Treasury
Internal Revenue Service

# Claim for Refund and Request for Abatement

► See separate instructions.

OMB No. 1545-0024

*Use Form 843 only if your claim involves (a) one of the taxes shown on line 3a or (b) a refund or abatement of interest, penalties, or additions to tax on line 4a.*

***Do not** use Form 843 if your claim is for—*
- *An overpayment of income taxes;*
- *A refund for nontaxable use (or sales) of fuel; or*
- *An overpayment of excise taxes reported on Form(s) 11-C, 720, 730, or 2290.*

Type or print

| | |
|---|---|
| Name of claimant<br>**Joyce A. Rineer** | Your SSN or ITIN<br>[redacted] : [redacted] :3845 |
| Address (number, street, and room or suite no.)<br>**8204 Hallmark Drive** | Spouse's SSN or ITIN<br>: : |
| City or town, state, and ZIP code<br>**North Richland Hills, Texas 76180** | Employer identification number (EIN)<br>: |
| Name and address shown on return if different from above | Daytime telephone number<br>( ) |
| **1 Period.** Prepare a separate Form 843 for each tax period<br>From 1 / 1 / 1997 to 12 / 31 / 1997 | **2** Amount to be refunded or abated<br>$ 759.00 |

**3a** Type of tax, penalty, or addition to tax:
☐ Employment ☐ Estate ☐ Gift ☐ Excise (see instructions)
☑ Penalty—IRC section ► 6672

**b** Type of return filed (see instructions):
☐ 706 ☐ 709 ☐ 940 ☐ 941 ☐ 943 ☐ 945 ☐ 990-PF ☐ 4720 ☐ Other (specify)

**4a** Request for abatement or refund of:
☐ Interest as a result of IRS errors or delays.
☐ A penalty or addition to tax as a result of erroneous advice from the IRS.

**b** Dates of payment ►

**5 Explanation and additional claims.** Explain why you believe this claim should be allowed, and show the computation of your tax refund or abatement of interest, penalty, or addition to tax. If you need more space, attach additional sheets.

**See Attached Statement marked Exhibit A. The payment that has been made relates to the taxes for one employee for the first quarter of 1997 with respect to Specialty Care, Inc.**

**Signature.** If you are filing Form 843 to request a refund or abatement relating to a joint return, both you and your spouse must sign the claim. Claims filed by corporations must be signed by a corporate officer authorized to sign, and the signature must be accompanied by the officer's title.

Under penalties of perjury, I declare that I have examined this claim, including accompanying schedules and statements, and, to the best of my knowledge and belief, it is true, correct, and complete.

Joyce Ann Rineer 12/15/06
Signature (Title, if applicable. Claims by corporations must be signed by an officer.) Date

Signature Date

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions. Cat. No. 10180R

EXHIBIT A

**Exhibit "A"**
**ATTACHMENT TO CLAIM FOR REFUND**
**for**
**JOYCE A. RINEER**
**SSN [redacted]-3845**

## 1. THE FACTS

Rose Washington ("Rose") and Joyce Rineer ("Joyce") started Specialty Care in 1988 with $5,000.00 and two nurses willing to do whatever it took to make the business successful. With hard work and determination Rose and Joyce developed the business from two nurses to over 250 nurses from one hospital contract to over 36 hospital contracts in both Dallas and Fort Worth. They obtained a line of credit that was initially $50,000.00 which was extended to $200,000.00 with First City Bank based on their financials prepared by their accountants, Martin and Bastie. As the company grew, Rose and Joyce saw an opportunity to expand in the early 1990's. Since they had been successful in providing excellent nurses in temporary staffing, many of their clients asked them if they would consider caring for some of their homebound Medicare patients. At that point, Rose and Joyce decided to open a home health agency.

In the early 1990's, Presbyterian Hospital in Dallas had a new hyperbaric chamber where many patients were receiving treatments for open wounds that were showing improved healing. Several Specialty Care nurses were invited to participate in an orientation so they could eventually take care of those patients once they were referred to the agency post discharge from the hospital. In l993 Specialty Care realized it would have challenges as a free standing home health agency because it did not have network contracts. Specialty Care had to establish relationships with physicians and referral sources and make them aware of the services it provided. Specialty Care also recognized that in order to obtain private insurance contracts it had to have Joint Commission Accreditation, which at that time cost approximately $20,000.00 to acquire.

Early on, in 1992-1993, Rose and Joyce recognized home health billing was unique, so Rose hired Janie Higgins ("Janie") who had previously worked in the accounting department at St. Joseph Hospital in Fort Worth. Janie was experienced in Medicare billing and set up Specialty Care's computer systems to accomplish in house billing for home health and hospital separately.

To accomplish its goals, Specialty Care required hiring a staff person with knowledge relative to accreditation standards. Specialty Care hired Shirley Beeler, a Masters prepared RN who was knowledgeable in the area of accreditation standards and who at that time was employed at the VA Dallas hospital where she oversaw their Continuous Quality Improvement Program. With the assistance of Shirley and a team of consultants, in 1995 Specialty Care became a Joint Commissioned Accredited Home Health Agency. Specialty Care now had the same ranking as local hospitals.

During all of this change in 1995, the business was continually being supported by hospital staffing. Nurses worked in the field taking care of patients, starting home visits at 6:00 a.m., and finishing at 6:00 p.m., because many of the visits were wound care or cancer patients. On an average, Joyce would put 100 to 125 miles a day on her car taking care of patients seven days a week. Many of those patients were patients cited in the literature that Medicare no longer wanted home health agencies to care for after I997. After receipt of its accreditation, Specialty Care continued to market physician groups by providing lunch and literature on its services. This marketing included Arlington Cancer Center, Baylor Dallas, Texas Oncology Fort Worth, Texas Oncology Southwest, Dr. Smithy, Dr. Thigpin, Dr. Rose, Dr. McLean, Heart Place of Arlington, and HEALTHSOUTH. At the same time, Specialty Care was requesting referrals from both the private insurance and Medicare patients, and placed much emphasis on its newly acquired accreditation.

The cost of doing business started taking its toll in 1996 when Specialty Care received its first notice of delinquent taxes. It was the beginning of Specialty Care's downward spiral related to doing business with Medicare. There were Medicare claims that had not been paid and which were in appeals pending further action. Operation Restore Trust 1997 had just been instituted and at the heart of the turmoil was a sharp reversal in federal policy. After a decade that saw Medicare spending for health care grow nearly tenfold, the government was clamping down to get a handle on the spending. Home care providers everywhere were taking drastic steps.

Healthcor Holding, Inc., a Dallas provider of home-nursing services, announced plans to close 32 of its 67 Medicare nursing offices and lay off 600 employees. Olsten Corp., which was based in Melville, NY, reported that it planned to restructure its nursing operations, including branch consolidation. Columbia/HCA Health Core Corp. placed its $1.2 billion home health care units up for sale in the wake of a wide ranging federal probe of alleged fraud according to Ann DeParle, Administrator of the Health Care Financing Administration. However, during all this turmoil, Specialty Care was never cited for any fraudulent claims nor was its home health license ever revoked for fraudulent practice. It was not uncommon to read in the newspaper about home health agencies closing because Medicare reimbursement regulations were driving agencies out of business, but Specialty Care felt that its hard work ethics and sheer determination to succeed would carry it through.

Each year Specialty Care was audited by a Medicare auditor and the auditor always cited overpayment after he reviewed paid claims of the previous year. For example, once Specialty Care was charged with an overpayment of $130,000.00. Since Medicare did not allow home health agencies to make a profit, Specialty Care did not have the money to pay $130,000.00, and therefore this amount was charged against its receivables. Sometimes it would take six to eight months to receive payment on pending claims, and most of the time Specialty Care received less than one-half the amount billed. Specialty Care was billing $50,000.00 to $75,000.00 a week in visits. On an average, over $10,000.00 in claims a week were placed in review by Medicare. Over time this ongoing process resulted

in Specialty Care not being able to continue to remain in business and caused it to become delinquent in payroll taxes.

In order to participate in the Medicare program Specialty Care was bound to the conditions of participation. Each Medicare patient had to have at least one skilled nurse visit per week based on homebound criterion and needed skill. A home health aide was allowed based on RN assessment and physician's orders. Physician's orders were valid for 60 days and had to be updated as the patient's homebound status changed.

In 1997, Specialty Care was notified that it had to have a $450,000.00 surety bond to do business with Medicare homebound beneficiaries to ensure it was financially responsible. This amount was based on the average billing of Specialty Care. Specialty Care did find a company that bonded it for $50,000.00. The 1997 law, which took effect in January, had three primary affects on the home care industry. Home care agencies were required to secure surety bonds of at least $50,000.00 to participate in Medicare. The law placed a cap on reimbursements to an agency based on its 1994 cost. The cap made it difficult for home care agencies to take care of patients with long-term illnesses because an agency would not receive higher Medicare payments even though the cost to care for the patient rose.

It was also mandated that Specialty Care provide physical therapy and occupational therapy services, which it was able to do because Specialty Care had a husband and wife team on staff that provided this service as well as a part-time social worker. Even though there were new mandates for home health care, there was a reduction in home health care spending by the federal government by $19.7 billion in just years 1998 and 1999.

Specialty Care took money from its staffing business to keep the home health business afloat because of the losses incurred as a result of trying to do business with Medicare. Specialty Care lost not only its home health business, but it also lost the staffing agency, developed a large tax debt, lost its line of credit and relationship with Theresa Ackers Lee, who was its loan officer with First City Bank. Specialty Care owed $100,000.00 to Bank of America, and also owed Rhema Medical for dressings and medical supplies. As the income of Specialty Care decreased, it had to decrease the staff because of difficulty meeting payroll. In 1999, Joyce worked for one year without pay, taking care of home care patients without receiving any income. Prior to working a year without pay, Joyce always carried a patient load as well as the administrative responsibilities.

## 2. WHAT IS HOME HEALTH?

Home health is funded by the Medicare program. It is a federal health insurance program for people age 65 or older, and for disabled beneficiaries and persons with chronic renal disorders. Services that are provided in the patient's home by a Medicare certified home health agency are: skilled nursing performed by licensed nurses and home health aides who give personal care, such as baths. Occupational therapy, speech therapy, and physical therapy are other services provided.

The Health Care Financing Administration (HCFA) contracts with insurance companies, called intermediaries. Trailblazers of New Mexico are the intermediary for Specialty Care. The intermediary governs, oversees, regulates, and handles all funding to the provider agencies, i.e., hospitals, home health, doctors, etc. At the present time there are only four intermediaries nationwide.

## 3. HOW AN AGENCY BECOMES CERTIFIED

The certification process for Specialty Care began in late 1992. A written request was filed with the Texas Department of Health. In 1994 Specialty Care opened its office as required by the state. Before the state surveyors could make their first onsite survey, Specialty Care had to be providing skilled nursing and home health aide services to 10 patients, and an onsite survey was conducted. Specialty Care cared for these patients from the start date until certification was granted, and was not allowed to be paid by Medicare for these services to the patients. The state certified Specialty Care in 1994, and it received a provider number from HCFA. Specialty Care began billing for services in 1994. At that time it took almost 30 days to receive reimbursement after bills were submitted.

## 4. HOW AN AGENCY IS FUNDED

Home health agencies operate in a cost-reimbursed system. A home health agency is only reimbursed costs (expenses) it has actually incurred. Because reimbursement (revenues) must equal expenses, an agency is not allowed to make a profit on services it performs for Medicare. Each year HCFA establishes a per-visit maximum reimbursement, or cost cap, for home health agencies. This "cost cap" is indexed by region to compensate for variances in salary rates and agencies' differing fiscal year-ends. Home health agencies are then reimbursed the lesser of their actual costs of doing business or the per-visit maximum.

Under this system, an agency which performs services (visits to patients) bills Medicare for these services, and Medicare reimburses the agency for each visit made. This is the only money the agency receives from Medicare which is a reimbursement by a cost per-visit rate. The reimbursement rate is an estimated amount designed to cover expenses associated with operating the home health agency such as salaries, benefits, rent, utilities, etc. At the end of the home health agency's fiscal year, the home health agency files a cost report with Medicare to show how the money was spent and to justify allowable expenses.

A cost report consists of a minimum of 29 pages of cost data based on the step-down method of cost funding and on the accrual basis of accounting. This report must be filed no later than five months following the close of the home health agency's fiscal year-end. Medicare has 30 days to determine if the cost report is acceptable. If the cost report indicates the home health agency was paid too much in reimbursement, the home health agency must return the funds to Medicare. In other words, if the home health

agency did not spend all of the reimbursement on allowable expenses, the home health agency must return the difference to Medicare.

If Medicare owes the home health agency money, Medicare has 60 days to pay the home health agency. Before any payment is made, Medicare applies several adjustment factors to this lump sum due to the agency. First, "in order to avoid any possible future overpayment," Medicare will reduce the lump sum by adjusting for errors or inconsistencies they have identified in the previously filed cost reports, calling this an audit adjustment factor (AAF). In essence, Medicare assumes that if an agency had a total of 10% of its total claimed costs denied on the cost report, then it will most likely do it again the next fiscal year; thus, guilty before proven innocent. Therefore, Medicare holds the home health agency's money for this reason. Also, it is Medicare's policy to further decrease any lump sum payments by 30% to also guard against any further overpayment that the agency might owe Medicare. Thus, a home health agency can operate for 12 months of a fiscal year at a deficit, due to being reimbursed at a rate insufficient to cover costs. Then the home health agency can file a cost report and wait another two months to collect a maximum of 70% of what is due them. This is only if Medicare owes the agency money.

On the other hand, if the home health agency owes Medicare, due to operation costs being less than what was reimbursed, the payment is demanded immediately, with a deadline of 15 days for the home health agency to pay the full amount due to Medicare. If the amount is not paid, all billing payments to the home health agency are immediately withheld to recoup that amount plus 14% interest until paid. Medicare would be owed an amount when they make the decision based on the cost report that a home health agency spent on an unallowable cost. The home health agency has the right to appeal in these cases. However, at this time the appeals are taking five years to make it to court. In the meantime, Medicare wants their money first. If the home health agency later wins the appeal, the agency's money will be refunded without interest.

If a home health agency costs more to operate than that paid by Medicare and Medicare pays the maximum amount of the cost cap, then the agency is simply out of luck. There is no recovery of the money the agency has spent.

This loss of money and the fact that Medicare holds money at times, for various reasons, places a great financial hardship on Specialty Care. Not paying the nurses would result in patient abandonment. Medicare has stated that any agency who abandons its patients will be decertified and criminal charges will be filed against the agency.

## 5. BILLING FOR SERVICES

The billing cycle runs from Thursday of one week to Wednesday of the next week. Claims are submitted for payment on Thursday of every week. The home health agency does not receive payment for these claims until 15 days after submission of the claims. If any of the claims have to be corrected because of an error on the claim, it is usually three working days before the home health agency is aware of the claims that have been

returned for correction. When these claims have been corrected and resubmitted, they receive a new submission date and are paid 15 days after the date of correction.

Every week the home health agency must hold several claims because of physician's orders that have been mailed to the attending physician for signature. According to state and federal regulations, these orders must be returned to the home health agency and placed in the patient charts before a claim on that patient is submitted for payment. Normal turnaround time on these orders is usually about one week; however, some physicians are extremely slow about returning orders.

It is not unusual for the agency to hold 15% of its claims because of unsigned physician's orders. If any order is outstanding, then no further billing on that patient may be submitted by the home health agency until the order is received. In other words, several weeks of claims are being held at any given time because of these unsigned orders. Periodically the intermediary issues Additional Development Requests (ADR's). These are claims that the home health agency has billed which are suspended from payment by the intermediary until later review of the additional documentation. The home health agency is required to submit copies of all the records in each patient's chart for the time period covered on the claim that the ADR is for. It may be a week or more before the home health agency is aware of the ADR. Sometimes the home health agency is not aware of the ADR until it is discovered that the claims have not been paid. This is 15 days after the claims were billed. Depending on the number of claims that have been suspended for ADR's, it takes several working days for the home health agency to compile the requested information and place it in the mail. After this information is received by the intermediary, it takes four to six weeks for the claim to be processed. If the person reviewing the claim determines that the claim is inappropriate for the patient, i.e., too many visits or that the patient is not qualified, then the home health agency is notified by mail of the determination and either a reduced payment or no payment at all is received by the agency 15 days after the claim is released.

If the home health agency disagrees with the determination, it may request an appeal. When an appeal is requested, all copies of the patient's records must be resubmitted to the intermediary and a different individual will review the claims. In the past these denied claims have been overturned by the individual reviewing the appeal; however, sometimes several months pass after the original claim is submitted for payment. Prior to 1999, during the last five years of Specialty Care's operation, 120 claims were hit with ADR's for a total billing of $1.5 million in claims. All were overturned on appeal with the exception of about $300,000.00, and some of those that were overturned took up to two years for Specialty Care to get paid for them.

Companies that operate to make a profit use the funds from their profit to carry them through difficult times. However, since a home health agency cannot make a profit, there are no funds available to meet its obligations when cash flow problems arise.

In the past, when Specialty Care received ADR's, payment was suspended only for the period of time covered by the claims under review. The home health agency was permitted to submit subsequent claims on its patients. With implementation of the Balanced Budget Act (BBA) of 1997, when a claim on a patient is suspended for any reason, i.e., medical review, ADR's, or corrections, no further claims on those patients can be billed until the suspended claim is paid. This puts billing on hold. Without billing there is no revenue.

## 6. HISTORY OF CLIENT

The first year of operation of Specialty Care in 1994 went well with success and rapid growth. In 1995, Specialty Care continued to grow rapidly, admitting and caring for approximately 150 patients in a five-county area. Specialty Care employed over 80 employees, spread over all five counties. Home health agencies were starting to come under increased scrutiny at this time. Operation Restore Trust, a program put into place to find fraud and abuse, was put into full operation. Several other programs were being set up with the intent of applying increased focus and pressure on the home health industry.

In this business, the patient load has to stay in balance with the cost. When the patient load drops, the cost per visit increases because there is less revenue to spread across the overhead. Certain things caused Specialty Care's patient load to drop substantially. When patient load drops so quickly and drastically, there is not enough time to compensate by cutting expenses.

In 1997 Specialty Care was notified of an onsite audit of its 1996 cost report. At that time they were assessed $130,000.00 which was appealed and denied. The auditor claimed that Medicare had overpaid $130,000.00 based on their new reduced rate which allowed Medicare to conduct an audit and request retroactive reimbursement.

Specialty Care did go through the appeals process; however, the loss of the $130,000.00 had a great impact on the agency and its cash flow. This financial audit resulted in a denial of $130,000.00 which Medicare wanted returned within 15 days. Since home health agencies are not allowed to make a profit, Specialty Care did not have $130,000.00 to return to Medicare. The appeals process for financial audits is backed up for five years. The business closed before the appeal was resolved.

The appeals process takes up to five years because there are 9,000 home health providers in this country, and the intermediaries interpret the rules differently with each provider, resulting in many audits demanding repayment of money. An auditor may deny one agency the cost of a seminar that was pre-approved by Medicare and then turn around and approve the same seminar for an agency only 30 miles away. Agencies have a right to equal application of the rules and regulations set forth by HCFA. Therefore, there is a backlog in the appeals process.

Specialty Care failed, and the failure to remit taxes owed to the IRS was the direct result of a system administered by Medicare. Joyce also relies on the documents attached hereto to support her position.

## 7. THE LAW

Joyce should not be held liable for the trust fund recovery penalty, since she was prevented from making payment by Medicare. By changing the rules, keeping Specialty Care from making a profit, and not timely paying reimbursement claims, Medicare prevented the taxes from being paid. Thus, there is reasonable cause to relieve Joyce from the trust fund recovery penalty.

The following is the authority upon which Joyce bases her position that she is not liable for the proposed trust fund recovery penalty assessment:

Liability under Section 6672 of the Internal Revenue Code is a question of fact, requiring two factual showings: first, the party assessed must be a party required to collect, account for, or pay over the withheld taxes (referred to as a "responsible person"); and second, the failure to pay must be "willful." **Hartman v. United States**, 538 F.2d 1336, 1340 (8th Cir. 1976).

Joyce does not concede that she is a "responsible person" within the meaning of Section 6672, or that "willfully" fail to collect and pay over the alleged trust fund taxes which are the subject of the trust fund recovery penalty that has been assessed against her.

The Internal Revenue Code (hereinafter "the Code") requires employers to withhold from employees' wages federal income taxes and social security contributions. Sections 3102 and 3402 of the Code. The employer holds these funds "in trust" for the United States. Section 7501(a) of the Code. When a corporate employer fails to pay over the trust funds, Section 6672(a) of the Code imposes a penalty equal to the entire amount of the unpaid taxes on "any person" required to collect, account for, or pay over the withheld taxes, who "willfully" fails to do so. Liability for the penalty is established if a person is a "responsible person" who "willfully" failed to pay over the withheld taxes. **Turnbull v. United States**, 929 F.2d 173, 178 (5th Cir. 1991); **Raba v. United States**, 977 F.2d 941, 943 (5th Cir. 1992); **Gustin v. United States**, 876 F.2d 485, 491 (5th Cir. 1989); **Wood v. United States**, 808 F.2d 411, 414 (5th Cir. 1987); **Howard v. United States**, 711 F.2d 729, 733 (5th Cir. 1983).

Section 6672(a) of the Internal Revenue Code of 1986 provides in pertinent part as follows:

> General Rule -- Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any

manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

The elements of the trust fund portion of payroll taxes are set forth as follows:

| **The Trust Fund Portion** | **Not Part of The Trust Fund Portion** |
|---|---|
| Employee's Federal Income Taxes Withheld From Paycheck | Employer's Matching Social Security Taxes |
| Employee's Portion of Social Security Taxes Withheld | Delinquency Penalties |
| | Accrued Interest For Non-Payment of Federal Unemployment Taxes (Form 940) |

Section 6672(a) is a collection device designed to insure payment of federal withholding taxes. The statute accomplishes its goal by piercing the corporate shell and shifting liability to those individuals actually responsible for collecting and paying payroll taxes. In keeping with its purpose, the penalty is normally assessed against a number of persons simultaneously. See, e.g., **Brown v. United States**, 511 F.2d 1136 (5th Cir. 1979).

Liability under Section 6672(a) is predicated on the following two elements:

(1) The failure must be attributable to a responsible person; and

(2) there must be a willful failure with regard to the collection or payment of federal payroll taxes.

Thus, the two relevant terms under the statute are "responsible person" and "willful."

Joyce did not "willfully" fail to collect and pay over the alleged trust fund taxes which are the subject of the proposed penalty. Persons within the scope of Section 6672 include those who exercise control over payment of business funds. **Genins v. United States**, 489 F.2d 95, 96 (5th Cir. 1974). It is the authority to control the disposition of funds which determines the responsibility for withholding and paying taxes. **Fort v. United States**, 48 AFTR 2d 81-5744 (ND Ill. 1981); **Morley v. United States**, 42 AFTR 2d 78-5691 (SD Tex. 1977).

The second element in determining whether a person is liable for the penalty is willfulness. A person cannot be responsible if he is not willful. In order to be willful, a person has to pay other creditors with knowledge that the taxes have not been paid and

not be prevented from paying the taxes. **Chappell v. United States**, 35 AFTR 2d 75-931 (SD Ill. 1975); **Godfrey v. United States**, 84-2 USTC ¶9974 (Fed. Cir. 1984); and **Kalb v. United States**, 35 AFTR 2d 74-5327 (2nd Cir. 1974).

In defining the term "willful" within the meaning of Section 6672(a), the Fifth Circuit Court of Appeals, which governs cases in Texas, has held that "reasonable cause" is part of the test for determining whether the failure to collect, account for, and pay over payroll taxes was willful. **Newsome v. United States**, 421 F.2d 215 (5th Cir. 1970). See also the Fifth Circuit case, verifying that "reasonable cause" is still a possible defense, **Bowen v. United States**, 88-1 USTC ¶9164 (5th Cir. 1988). The Court of Claims also has approved a reasonable cause defense in **L.C. McCarty v. United States**, 71-1 USTC ¶9232 (Ct.Cl. 1971).

Willfulness under Section 6672 of the Code requires only a voluntary, conscious, and intentional act--not a bad motive or evil intent. **Mazo v. United States**, 591 F.2d 1151, 1154 (5th Cir. 1979); **Gustin v. United States, supra**, at 492. Willfulness is normally proved by evidence that the responsible person paid other creditors with knowledge that withholding taxes were due at the time to the United States. **Gustin v. United States, supra**, at 492. "A considered decision not to fulfill one's obligation to pay the taxes owed, evidenced by payments made to other creditors in the knowledge that the taxes are due, is all that is required to establish willfulness." **Howard v. United States, supra**, at 736. Willfulness is normally proved by evidence that the responsible person paid other creditors with knowledge that withholding taxes were due at the time to the government. **Morgan v. United States**, 937 F.2d 281, 285 (5th Cir. 1991).

Reasonable cause is a defense to trust fund recovery penalty. In **Finley v. United States**, 123 F.3d 1342 (10th Cir. 1997), sitting en banc, the Tenth Circuit held that reasonable cause is a defense to the trust fund recovery penalty, rejecting the Government's attempt to limit jury consideration of that defense.

In **Finley**, Floyd Johnson was president and a member of the board of directors of Halsey-Tevis, Inc., a struggling corporation engaged in the interior construction business. In late October 1988, Mr. Johnson learned from board member and secretary-treasurer, Edward Finley, that Halsey-Tevis was delinquent in paying federal social security and income taxes withheld from employee wages during the third and fourth quarters of 1988. Upon learning of the delinquency, Mr. Johnson told Mr. Finley that the taxes had to be paid. Mr. Johnson made no further inquiry and took no further action regarding the unpaid withholding taxes even though he had authority to sign company checks and, at that time, Halsey-Tevis had access to funds that could have been used to make at least partial payment to the IRS.

In November 1988, Mr. Johnson found out that the taxes still had not been paid. On November 14, 1988, Mr. Johnson and Mr. Finley delivered about $105,000 in collections to the company's bank and asked bank officials to apply the deposit to the

withholding tax balance. The bank refused and instead applied the deposit to the company's loan from the bank.

After a jury trial in the district court, the jury rendered a verdict for Mr. Johnson, finding that he was not willful in failing to pay the withheld taxes to the IRS. However, the district court granted the United States' post-trial motion for a judgment as a matter of law, and reversed the jury verdict, holding that a reasonable jury could not have found that Mr. Johnson met his burden of proof.

The Tenth Circuit Court of Appeals has now held that a jury must determine whether there is reasonable cause for failure to pay employment taxes to the IRS. If a taxpayer can show reasonable cause, then there is no willfulness on the part of the taxpayer against whom the trust fund recovery penalty is being assessed.

In hearing the case en banc, the Tenth Circuit reviewed the question of whether under Section 6672 of the Internal Revenue Code, if a responsible person fails to investigate or correct mismanagement after learning of a withholding tax delinquency, must his conduct be found reckless and therefore willful as a matter of law, or, in the alternative, should the jury, in the view of all relevant evidence, be entitled to find the responsible person did not act recklessly?

The Tenth Circuit in reversing the district court held that willful conduct as defined in the context Section 6672 can be negated by a showing that the responsible person had reasonable cause for failing to pay withholding taxes held in trust for the government. This ruling negates the strict liability interpretation of Section 6672 and preserves a role for the fact finder, to determine whether, in view of all relevant evidence, a responsible person willfully failed to pay employee withholding taxes.

The Tenth Circuit recognized the reasonable cause exception. The Tenth Circuit concluded that reasonable cause sufficient to excuse a responsible person's failure to pay withholding taxes should be limited to those circumstances where (1) the taxpayer has made reasonable efforts to protect the trust funds, but (2) those efforts have been frustrated by circumstances outside the taxpayer's control.

The willfulness test determines if a person knew the taxes were not paid and willfully and intentionally did not remit the funds to the IRS after knowing that such funds were due. The courts consider the state of mind of the person at the time of the willful act as a material fact, but each court uses different criteria. **A finding of reasonable cause is not sufficient to overturn a finding of willfulness.** Willfulness includes a reckless disregard of a known or obvious risk that trust fund taxes would not be paid to the IRS.

To be excused for failure to timely pay taxes owed, a taxpayer must show that the failure (1) did not result from willful neglect, and (2) was due to reasonable cause. **United States v. Boyle**, 469 U.S. 241, 244 (1985); see also **Am. Biomaterials Corp. v. Creative**

**Care Sys.**, 954 F.2d 919, 923 (3d Cir. 1992). Willful neglect is a conscious, intentional failure or reckless indifference. Reasonable cause exists if the taxpayer exercised ordinary business care and prudence, but nevertheless was unable to file the return within the prescribed time.

There is misconduct by the government by leading home health agencies into the belief that they would be reimbursed for care given. Medicare has breached its duty to these agencies and prevented them from receiving reimbursement. As a result of the breach by Medicare, the trust fund taxes could not be paid by Specialty Care. The attached documents support Joyce's position.

Several circuits have adopted hybrid reasonable cause exceptions that combine subjective and objective features. For example, in **Finley v. United States**, **supra**, at 1348, the Tenth Circuit, sitting en banc, held that reasonable cause sufficient to excuse the failure to pay employment taxes existed when: "(1) the taxpayer has made reasonable efforts to protect the trust funds, but (2) those efforts have been frustrated by circumstances outside the taxpayer's control."

Willfulness can be proved by showing that the responsible person recklessly disregarded his duty to collect, account for, and pay over the trust fund taxes or by showing that the responsible person ignored an obvious and known risk that the trust funds might not be remitted. The concomitant of this rule must be that absence of willfulness can be proved by an affirmative showing that the responsible person did not disregard his duties, and that he undertook all reasonable efforts to see that such taxes would in fact be paid, in circumstances where the employer had the means of payment and could reasonably be expected to make the payment.

More recently, the standard for willfulness adopted by the Federal Circuit in **Godfrey v. United States**, **supra**, clearly incorporated subjective elements, indicating that to be willful, one must act "voluntarily" and "consciously," emphasizing further that "relevant evidence bearing on the element of personal fault may not be ignored." **Godfrey**, **supra**, at 1577.

**7. Conclusion**

There is reasonable cause to relieve Joyce from the trust fund recovery penalty that has been assessed against her.